Kevin CORNWELL et al., Plaintiffs,

v.

CREDIT SUISSE GROUP
et al., Defendants.

No. 08 Civ. 3758(VM).

United States District Court,
S.D. New York.

Oct. 5, 2009.

Bernard M. Gross, The Law Office of Bernard M. Gross, P.C., Philadelphia, PA, Darren J. Robbins, David C. Walton, Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA, David Avi Rosenfeld, Samuel Howard Rudman, Coughlin Stoia Geller Rudman & Robbins, LLP, Melville, NY, Deborah R. Gross, Law Offices Bernard M. Gross, P.C., Philadelphia, PA, Beth Ann Kaswan, Scott + Scott, L.L.P., Jonathan Gardner, Labaton Sucharow, LLP, New York, NY, William H. Narwold, Motley Rice LLC, Hartford, CT, for Plaintiffs.

Richard W. Clary, Cravath, Swaine & Moore LLP, New York, NY, for Defendants.

### *DECISION AND AMENDED ORDER*

VICTOR MARRERO, District Judge.

Lead plaintiffs Kevin Cornwell ("Cornwell"), John M. Grady ("Grady"), Erste–

Sparinvest Kapitalanlagegesellchaft m.b.H. ("Erste"), and Irish Life and Permanent PLC ("ILP") (collectively, "Lead Plaintiffs") filed a consolidated amended complaint in this action, dated October 20, 2008 (the "Amended Complaint"), naming as defendants Credit Suisse Global ("CSG"), Brady W. Dougan ("Dougan"), Renato Fassbind ("Fassbind"), D. Wilson Ervin ("Ervin"), and Paul Calello ("Calello") (collectively, "Defendants"). Lead Plaintiffs assert claims under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) (" § 10(b)"), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Lead Plaintiffs bring these claims on behalf of themselves and all other persons or entities, except for Defendants, who purchased CSG securities during the period February 15, 2007 through April 14, 2008 (the "Class Period"). Defendants move to dismiss Lead Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") for lack of subject matter jurisdiction and Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") for failure to state a claim upon which relief can be granted.

By Order dated September 28, 2009 (the "September 28 Order") the Court granted Defendants' motion to dismiss pursuant to Rule 12(b)(1). The Court now sets forth its findings, reasoning, and conclusions in support of the September 28 Order.

### I. *BACKGROUND*[1]

During the 1990s and early 2000s, CSG and other investment banks purchased se-

---

1. This factual background is derived from the Amended Complaint and documents attached thereto, referenced therein or integral to its drafting. In deciding a motion to dismiss under Rule 12(b)(1), the Court may consider these documents. *See Wetzel v. Town of*

*Orangetown,* No. 06 Civ. 5144, 2007 WL 3009999, at *4 (S.D.N.Y. Oct. 12, 2007); *Faggionato v. Lerner,* 500 F.Supp.2d 237, 243 (S.D.N.Y.2007); *Miller v. Lazard, Ltd.,* 473 F.Supp.2d 571, 575 (S.D.N.Y.2007) (*citing*

curities backed by high-risk mortgages. The underlying mortgages had been issued to individuals with low credit scores, and thus were referred to as "sub-prime." These mortgages carried risky features such as low introductory rates, no income or asset verification of borrower, high loan-to-value ratios, payment of only the interest on the loan for an initial period, and principal that grew over time. When loans incorporating exotic features such as those described above were issued to borrowers with credit scores that did not qualify as sub-prime, CSG referred to them as "Alternative–A" ("Alt–A") loans. Investment banks bundled high-risk loans into a variety of securities called asset-backed securities. These securities included products such as residential mortgage-backed securities, collateralized debt obligations, and auction rate securities ("ARSs") that are asset-backed. When the housing market began to decline and interest rates increased, mortgage default rates rose and affected securities tied to the underlying high-risk loans.

Despite the faltering housing market and its effects on asset-backed securities, CSG reported strong results for the 2006 fiscal year and the first two quarters of 2007. Although CSG acknowledged the housing crisis, it did not quantify its exposure to sub-prime mortgages. CSG stated that it had fared relatively well when compared with its peer firms, some of which had suffered significant losses from asset-backed securities. CSG attributed its record results and de minimus sub-prime risk exposure to its strong risk management programs and internal controls.

On August 28, 2007, the Securities and Exchange Commission ("SEC") wrote to Fassbind, the Chief Financial Officer of Credit Suisse Group and Credit Suisse Securities, asking for information regarding CSG's sub-prime exposure beyond what had been provided on CSG's 2006 Form 20–F.[2] Fassbind responded on September 26, 2007 that providing detailed information about all of CSG's sub-prime assets would be burdensome and that such disclosure was not necessary because the risk of a material loss related to these loans was remote. Fassbind pointed to several steps CSG had taken to mitigate any risk associated with these loans, including reducing the number of loans acquired, investing in loans with lower credit risk, and distributing the loans owned by CSG. Fassbind also stated CSG had reduced its sub-prime exposure through hedging. On October 16, 2007, the SEC again encouraged Fassbind to carefully evaluate CSG's sub-prime investments. Fassbind responded by letter dated November 13, 2007, indicating that he would heed the SEC's advice.

For the third and fourth quarters of 2007, CSG announced some asset markdowns, while continuing to emphasize its relative weathering of the mortgage crisis that had severely affected some of its peer banks.

In the third quarter of 2007, CSG announced some markdowns from declines in the values of its ARSs, some of which were

---

*Chambers v. Time Warner,* 282 F.3d 147, 152–53 (2d Cir.2002)). "A court confronted with a jurisdictional controversy may consider evidence outside the pleadings." *City of Edinburgh Council v. Vodafone Group Public Co.,* No. 07 Civ. 9921, 2008 WL 5062669, at *4 (S.D.N.Y. Nov. 24, 2008) (*citing Filetech S.A. v. France Telecom S.A.,* 157 F.3d 922, 932 (2d Cir.1998)). Unless specifically referenced, no further citation to these sources will be made.

2. The Amended Complaint describes Form 20–F as a form filed with the SEC by a "non U.S. public parent company trading in the United States" that is "in all material respects the equivalent of a Form 10–K for a U.S. public company." (Amended Complaint ¶ 2.)

in client money market accounts. It was later revealed that two CSG traders had falsified e-mails to clients which purported to confirm that the ARSs in their accounts were backed by safer assets such as student loans, when they were actually backed by sub-prime securities. Civil and criminal suits have been filed against these traders and the defrauded customers have pursued recovery from CSG.

One week after announcing its results for the fourth quarter of 2007, CSG announced an additional $2.8 billion in asset markdowns. CSG stated that the markdowns were necessary because a rogue group of employees in London had mis-marked the value of certain structured products. On March 20, 2008, CSG issued revised 2007 results that reflected these mis-markings. The Financial Services Authority ("FSA"), the regulatory body in the United Kingdom, later fined CSG for these mis-markings.

During the Class Period, Cornwell and Grady purchased CSG shares by buying American depository receipts ("ADRs")[3] on the New York Stock Exchange ("NYSE"). The Amended Complaint does not state the nationality or place of residence of Cornwell or Grady. Erste and ILP also purchased CSG shares during the Class Period, on the Swiss exchange. Erste is an investment company based in Austria, and ILP is an Irish corporation.

Lead Plaintiffs brought this suit alleging that Defendants had hidden CSG's high-risk exposure to sub-prime and Alt–A loans and had touted CSG's internal controls and risk management programs as having helped CSG avoid the negative effects from the downturn in the housing market. Lead Plaintiffs claim that state-

ments about these controls and CSG's strong financial performance were false and misleading because Defendants knew that CSG did not properly value its assets; failed to disclose the full extent and amount of its exposure to sub-prime risk; improperly transferred high-risk and illiquid securities into client money market accounts in order to shift these securities off CSG's books; and violated Generally Accepted Accounting Principles ("GAAP") as a result of all of the improper activities described above.

Lead Plaintiffs also allege that Defendants were aware that there were flaws in CSG's risk management and internal controls because two criminal schemes were uncovered during the Class Period, one involving mis-marking of assets and the other involving falsified e-mails to clients hiding the illiquid and risky securities being transferred into their money market accounts. Lead Plaintiffs allege that misrepresentations about the schemes caused them to pay inflated prices for CSG shares and ADRs during the Class Period.

## II. *DISCUSSION*

■ In reviewing the motion to dismiss, the Court will first address grounds that challenge its subject matter jurisdiction because, absent authority to adjudicate, the Court lacks a legal basis to grant any relief, or even consider the action further. *See Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008) ("Determining the existence of subject matter jurisdiction is a threshold inquiry, and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power

---

**3.** ADRs "are issued by U.S. depository banks and represent one or more shares of foreign stock or a fraction of a share." *Morrison v. National Australia Bank Ltd.,* 547 F.3d 167, 168 n. 1 (2d Cir.2008) (internal quotation marks and citation omitted). Ownership of an ADR gives the holder the right to obtain the foreign stock represented by the ADR. *See id.*

to adjudicate it." (internal citations and quotation marks omitted)); *Can v. United States,* 14 F.3d 160, 162 n. 1 (2d Cir.1994) ("[I]n most instances the question whether a court has subject-matter jurisdiction is, conventionally and properly, the first question a court is called on to consider."). Because the Court ultimately finds that it lacks subject matter jurisdiction over the claims of any of the Lead Plaintiffs, it will not address the motion to dismiss pursuant to Rule 12(b)(6).

## A. *LEGAL STANDARD*

■ The parties direct their arguments toward the question of whether the Court has subject matter jurisdiction over the claims of the foreign Lead Plaintiffs, Erste and ILP, that purchased CSG shares on the Swiss exchange, and the Court will address that question first. The Court will then address the question of subject matter jurisdiction over the claims of Cornwell and Grady, the Lead Plaintiffs who purchased their CSG shares by acquiring ADRs on the NYSE. Although the parties did not directly address this issue in their motion papers, the Court "may examine subject matter jurisdiction, sua sponte, at any stage of the proceeding." *Adams v. Suozzi,* 433 F.3d 220, 224 (2d Cir.2005).

### 1. *Rule 12(b)(1)*

■ The inquiry on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) concerns whether the district court has the statutory or constitutional power to adjudicate the case. *See Arar,* 532 F.3d at 168. "[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it ex-

ists." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). In reviewing a motion to dismiss for lack of subject matter jurisdiction, a court may consider evidence outside the pleadings. *See id.*

### a. *Foreign Lead Plaintiffs Who Purchased CSG Shares on a Foreign Exchange*

■ Although the Exchange Act is silent as to its extraterritorial application, federal courts have exercised subject matter jurisdiction over claims "implicating transnational securities fraud." *City of Edinburgh Council v. Vodafone Group Public Co.,* No. 07 Civ. 9921, 2008 WL 5062669, at *2 (S.D.N.Y. Nov. 24, 2008) (*citing SEC v. Berger,* 322 F.3d 187, 192 (2d Cir.2003)). Courts tasked with determining whether they have subject matter jurisdiction over securities law claims with international elements must consider "whether Congress would have wished the precious resources of the United States courts ... to be devoted to such transactions." *Morrison v. National Australia Bank Ltd.,* 547 F.3d 167, 170 (2d Cir.2008) (internal quotation marks and citations omitted). In examining these issues, courts employ two tests, known as the "conduct test"—"whether the wrongful conduct occurred in the United States"— and the "effects test"—"whether the wrongful conduct had a substantial effect in the United States or upon United States citizens." *Id.* at 171 (citing *Berger,* 322 F.3d at 192–93).

■ Subject matter jurisdiction will be found under the conduct test if the acts that took place in the United States were "more than merely preparatory to a fraud and culpable acts or omissions occurring here directly caused losses to investors abroad." *Id.* If the acts that occurred in the United States are "merely secondary to the core acts of the fraud," they will not

satisfy the conduct test. *Vodafone*, 2008 WL 5062669, at *3 (*citing Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 128–29 (2d Cir.1998)). "Determining what is central or at the heart of a fraudulent scheme versus what is 'merely preparatory' or ancillary can be an involved undertaking." *Morrison*, 547 F.3d at 174. A court must perform an intensely fact-specific analysis of which acts constituted the alleged fraud and where they were committed. *See id.* at 173–74; *Vodafone*, 2008 WL 5062669, at *3; *In re Alstom S.A. Secs. Litig.*, 406 F.Supp.2d 346, 385–86 (S.D.N.Y.2005). A "determination of whether American activities 'directly' caused losses to foreigners depends on what and how much was done in the United States and on what and how much as done abroad." *Morrison*, 547 F.3d at 171.

■ Subject matter jurisdiction exists if either the conduct test or the effects test is satisfied, but "an admixture or combination of the two often gives a better picture of whether there is sufficient United States involvement to justify the exercise of jurisdiction by an American court." *Id.* (*quoting Itoba Ltd. v. Lep Group PLC*, 54 F.3d 118, 122 (2d Cir.1995)). However, "it must nevertheless be recognized that consideration of the effects test alongside the conduct test is unlikely to provide any additional benefit to foreign plaintiffs in a class action lawsuit who purchased a foreign company's stock on a foreign exchange." *In re SCOR Holding (Switzerland) AG Litig.*, 537 F.Supp.2d 556, 562 (S.D.N.Y.2008); *see also Alstom*, 406 F.Supp.2d at 369 (noting that the effects test "has no bearing in an action involving the claims of foreign purchasers of a foreign company's securities on foreign exchanges"). "[T]he effects test focuses principally on the impact of overseas activity on U.S. investors and securities traded on U.S. securities exchanges," and "generalized effects ... such as a loss of investor confidence or a decline in purchases by foreign investors in U.S. markets, do not suffice." *SCOR Holding*, 537 F.Supp.2d at 562 (internal quotation marks and citations omitted). Because the effects test considers whether U.S. investors and markets have suffered concrete harm,

> an undifferentiated class of foreign investors seeking damages will typically be unable to identify any relationship between, on the one hand, the harm its members suffered as a result of the alleged fraud and, on the other, any harm to U.S. markets or U.S. investors such that the effects test will play any role in the jurisdictional analysis.

*Id.* The Court will therefore focus on the conduct test when considering whether it has subject matter jurisdiction over the claims of Erste and ILP.

b. *Lead Plaintiffs Who Purchased CSG Shares Through ADRs on the NYSE*

Cornwell and Grady purchased CSG shares through ADRs on the NYSE. The Court will consider both the conduct test and the effects test when determining whether it has subject matter jurisdiction over Cornwell and Grady's claims.

B. *APPLICATION*

1. *Frauds Alleged in the Amended Complaint*

When examining the Court's own subject matter jurisdiction, the Court must first analyze "what conduct comprises the heart of the alleged fraud." *Morrison*, 547 F.3d at 175. The Court must therefore determine what frauds the Lead Plaintiffs are alleging caused them harm. Lead Plaintiffs make numerous allegations regarding flaws with CSG's internal controls, risk management, and the way in which CSG accounted for its high-risk investments. They assert that statements made

by Defendants were false and misleading because Defendants knew or should have known about these flaws, even as they continually touted CSG's record financial results and emphasized its strong risk management practices. Although some statements regarding CSG's financial health and risk management practices are alleged to be misleading for many reasons, the Amended Complaint makes reference to five categories of fraud, each with the goal of overstating CSG's financial success.

### a. *Flawed Valuation System*

Lead Plaintiffs claim that Defendants made material misstatements and omissions regarding CSG's flawed valuation system, and thereby caused CSG to overstate the value of its assets. Lead Plaintiffs assert that CSG's compensation structure encouraged unrealistic asset valuations because it tied an employee's compensation to the declared value of the financial instruments the employee managed. Defendants allegedly knew that CSG's system was faulty because internal testing had revealed significant discrepancies in valuations of the same asset by two separate groups. Lead Plaintiffs also assert that Defendants failed to heed warnings from regulators about the pressures that CSG's compensation structure put on employees to over-value assets and downplay risk. Lead Plaintiffs conclude that, despite knowing that CSG's system was flawed, Defendants made statements about the accuracy of its valuation method. Lead Plaintiffs claim that this incentive to inflate valuations, coupled with weaknesses in CSG's internal controls, allowed the rogue group of employees in London to mis-mark a significant amount of assets. Although CSG eventually disclosed this scheme and wrote down the inflated value of the mis-marked assets, Lead Plaintiffs claim that these write-downs were not all attributable to the rouge employees and were instead attributable to flaws in the overall valuation system in place at CSG.

The Amended Complaint asserts that CSG, "in its financial reports, claimed to use sophisticated models to manage its significant risks over the pricing and valuation of complex structured assets." (Amended Complaint ¶ 117.) The Amended Complaint alleges that material misstatements and omissions regarding CSG's valuation methodology and its financial earnings were made in the 2006 Form 20–F; the 2006 Annual Report; various quarterly financial statements in 2006 and 2007; and several earnings calls that took place in 2007 and 2008. (*See id.* ¶¶ 227–61.)

### b. *Placing ARSs in Client Accounts*

Lead Plaintiffs allege that CSG hid its sub-prime exposure by "wrongfully foist[ing] sub-prime and illiquid investments on unwitting clients." (*Id.* at 86.) Lead Plaintiffs allege that CSG offered its clients money market accounts as a low risk, secure cash management tool, but then used these accounts to hide its sub-prime exposure by placing ARSs backed by high-risk loans in them. This scheme, Lead Plaintiffs allege, allowed CSG to shift these risky investments off CSG's balance sheet. When ARS auctions began to fail, CSG was forced to stabilize client accounts and remove their exposure to sub-prime assets by buying CHF 9.3 billion in ARSs back from them. Lead Plaintiffs argue that this overall scheme relates to the criminal wrongdoing of two CSG employees, Julian Tzolov ("Tzolov") and Eric Butler ("Butler"), who are accused of placing ARSs in client accounts against the clients' directions and creating fraudulent e-mails to mislead clients about the character of the securities. Lead Plaintiffs further allege that Defendants did not make a timely disclosure regarding the Tzolov/Butler

scheme and tried to hide the scheme from clients and the public.

Defendants allegedly made false and misleading statements or omissions regarding this ARS scheme by reporting financial results that were boosted by the undisclosed ARS scheme. The Amended Complaint alleges that material misstatements and omissions regarding the ARS scheme and its impact on CSG's financial results were made in the 2006 Form 20–F; the 2006 Annual Report; various quarterly financial statements in 2006 and 2007; and several earnings calls that took place in 2007 and 2008. (*See id.* ¶¶ 227–61.)

c. *Flaws in Internal Controls and Risk Management*

Lead Plaintiffs make general allegations about weaknesses in CSG's internal controls and risk management. Defendants allegedly knew that there were systemic internal controls problems and risk management weaknesses at CSG. Lead Plaintiffs claim that Defendants knew or should have known of these flaws, and that Defendants made material misstatements and omissions regarding CSG's risk management practices and financial results in the 2006 Form 20–F; the 2006 Annual Report; various quarterly financial statements in 2006 and 2007; correspondence between the SEC and Fassbind from 2007; and several earnings calls that took place in 2007 and 2008. (*See id.*)

d. *Sub-prime Exposure*

Lead Plaintiffs allege that CSG refused to quantify its sub-prime exposure and made false or misleading statements about CSG's "de minimus" sub-prime risk and the "remote" possibility of material loss because of these investments. As described above, Lead Plaintiffs allege that CSG underestimated or hid its sub-prime exposure in many ways, but Lead Plaintiffs also allege that CSG's failure to quantify its sub-prime risk or to generally rec-

ognize the threat this risk posed publicly was also fraudulent. Lead Plaintiffs point to Fassbind's correspondence with the SEC, and Dougan's refusal to provide details regarding this exposure on conference calls.

According to Lead Plaintiffs, Defendants also misrepresented the effectiveness of CSG's hedging activities with respect to sub-prime exposure. Defendants allegedly represented that CSG's hedging strategy allowed it to avoid the more extreme effects of the mortgage meltdown, when compared to its peers. However, Lead Plaintiffs claim that CSG's hedges were not effective partly because the trades often were not confirmed with the counterparty and therefore were never closed or perfected. CSG assumed, for purposes of its financial reporting, that its hedges were effective, and thereby under-reported its sub-prime exposure.

The Amended Complaint alleges that material misstatements and omissions regarding CSG's exposure to risk and losses from sub-prime products and the effectiveness of its hedging strategy, as well as CSG's financial results, were made in the 2006 Form 20–F; the 2006 Annual Report; various quarterly financial statements in 2006 and 2007; correspondence between the SEC and Fassbind from 2007; and several earnings calls that took place in 2007 and 2008. (*See id.* ¶¶ 4, 227–61.)

e. *GAAP Violations*

Finally, Lead Plaintiffs allege that the conduct described above was incorporated into CSG's financial records, and that Defendants therefore violated GAAP by using these faulty valuations and not accounting for sub-prime risk on CSG's balance sheet. The Amended Complaint alleges that material misstatements and omissions regarding CSG's financial results constituted GAAP violations, and were made in the

2006 Form 20–F; the 2006 Annual Report; and various quarterly financial statements in 2006 and 2007. (*See id.* ¶ 291.) The Amended Complaint details various accounting principles and GAAP requirements that Defendants allegedly violated when reporting financial results. (*See id.* ¶¶ 291–323, 333.)

### 2. *Claims of Foreign Lead Plaintiffs*

■ Lead Plaintiffs allege a variety of conduct in the Amended Complaint, but to determine subject matter jurisdiction the Court considers whether "activities in this country were more than merely preparatory to a fraud and culpable acts or omissions occurring here directly caused losses to investors abroad." *Morrison,* 547 F.3d at 171. The Court must focus on identifying "what conduct comprises the heart of the alleged fraud," *id.* at 175, and determine whether Lead Plaintiffs have shown by a preponderance of the evidence that the conduct occurred in the United States.

Lead Plaintiffs hang their jurisdictional arguments mostly on the fact that CSG's investment banking segment is headquartered in New York, and that certain investment banking and risk management officers, including Ervin, the Chief Risk Officer of Credit Suisse Securities, live and work in New York. (*See, e.g.,* Amended Complaint ¶¶ 22, 24.) Thus, they argue that the securities packaged in furtherance of a scheme to mislead investors were "likely" structured, managed and sold in New York. (*Id.* at ¶ 22.) They also allege that the faulty risk management procedures and internal controls were "undoubtedly" managed in New York because Ervin was located there. (*Id.* at ¶ 24.) The activities in New York that Lead Plaintiffs allege relate to all five of the frauds laid out by the Amended Complaint.

These allegations are not sufficient to show by a preponderance of the evidence that acts that comprise the heart of the fraud were committed in the United States. Lead Plaintiffs compare this case to *SEC v. Berger,* 322 F.3d 187 (2d Cir. 2003), in which the Second Circuit found that the district court had subject matter jurisdiction over an action in which allegedly false account statements had been issued from the British Virgin Islands. In that case, the Circuit Court determined that the defendant had "masterminded and implemented" the fraudulent scheme in the United States. *Id.* at 194.

Here, Lead Plaintiffs have not adequately alleged or otherwise demonstrated that the fraudulent schemes described above were concocted or masterminded in the United States. They merely state that some of CSG's business is managed in New York and that some officers live and work in New York. In *Berger,* as described by *Morrison,* "[t]he critical factor was that the conduct that directly caused loss to investors—the creation of the fraudulent [account] statements-occurred in New York." *Morrison,* 547 F.3d at 174 (discussing Berger). Lead Plaintiffs stress the alleged schemes to overvalue assets, underestimate risk, hide sub-prime exposure, and ignore the weaknesses of CSG's risk management and internal controls, but these alleged schemes affected investors only insofar as investors relied upon statements made about CSG's financial strength by its officers and in its financial statements. Although the way in which CSG valued its assets or accounted for risk "may have contributed to the misinformation, a number of significant events needed to occur before this misinformation caused losses to investors." *Id.* at 177. Those intermediate steps took place not in the United States, but in Switzerland, where most of the alleged misstatements were made and the financial statements were compiled. Lead Plaintiffs' characterization of the packaging of securities or the sale of ARSs as the heart of the fraud is mis-

placed because "'deceptive acts [that] were not communicated to the public'" do not suffice to "'show reliance . . . except in an indirect chain that we find too remote for liability.'" *Id.* (*quoting Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 128 S.Ct. 761, 769, 169 L.Ed.2d 627 (2008)).

The Court finds that the heart of the frauds complained of in this case consists of the alleged misstatements and omissions regarding CSG's financial state (which are alleged to constitute GAAP violations), and the alleged misstatements and omissions regarding the business practices affecting CSG's financial results: CSG's valuation system; its placement of ARSs in client accounts; its risk management practices; and its sub-prime exposure. The underlying business practices highlighted by Lead Plaintiffs are not the essential core of the alleged frauds. "Though § 10(b) is not limited to preserving the integrity of the securities markets, . . . it does not reach all commercial transactions that are fraudulent and affect the price of a security in some attenuated way." *Stoneridge,* 128 S.Ct. at 771 (internal quotation marks and citation omitted). A flawed risk management system and inaccurate estimates of sub-prime exposure do not necessarily, by themselves, subject Defendants to liability for securities fraud because § 10(b) prohibits the use of a "manipulative or deceptive device" only when it occurs "in connection with the purchase or sale of a . . . security." As pleaded in the Amended Complaint and argued in Lead Plaintiffs' papers in opposition to the motion to dismiss,[4] the securities fraud alleged with respect to the purportedly flawed valuation system occurred when Defendants made representations about the valuation system and issued financial results that relied upon that valuation system. Similarly, Defendants' allegedly flawed risk management system and inaccurate estimates of sub-prime exposure constitute securities fraud only when representations were made about risk management or sub-prime exposure, or when financial results incorporating such shortcomings were issued.

The Court therefore finds that the heart of the fraud asserted in this action consists of the alleged misrepresentations and omissions regarding CSG's financial performance and the business practices cited by Lead Plaintiffs. As explained below, most of these statements originated abroad, and the statements or acts that do or could constitute wrongful acts in the United States fail to satisfy the conduct test.

*a. Swiss Statements*

The frauds alleged by Lead Plaintiffs all rely upon CSG's financial results and statements by the Defendants about CSG's financial results and business practices. Insofar as these financial results and statements were issued from CSG's headquarters in Switzerland, that conduct does not support a finding of subject matter jurisdiction because those acts did not take place in the United States. All of the frauds alleged rely upon statements that were issued in Switzerland, including the 2006 Annual Report and the quarterly financial statements issued by CSG in 2006 and 2007. (*See* Declaration of Yonatan Even, dated December 19, 2008, Exs. 1–4 (Excerpt of CSG's 2006 Annual Report; excerpt of CSG's 2006 Form 20–F; CSG

---

4. The Amended Complaint contains the section heading, "False and Misleading Statements and Omissions About the Company's Financial Performance, Exposures and Risk From the Sub–Prime Crisis." (Amended Complaint at 102.) The Lead Plaintiffs' Cor- rected Memorandum of Law in Opposition to the Motion to Dismiss ("Pls.' Opp'n") contains the subheading, "The Complaint Alleges Actionable Misrepresentations and Omissions." (Pls.' Opp'n at 12.)

press releases; CSG's first and second quarter 2007 Financial Review).) The 2006 Annual Report and the quarterly financial filings were prepared and issued from CSG's headquarters in Zurich, and it was the propagation or publishing of the Annual Report and those financial statements, from Zurich, that "constituted the fraud and directly caused the harm" stemming from any shortcomings in CSG's business practices. *Morrison*, 547 F.3d at 173. In addition, Fassbind's correspondence with the SEC was presumably prepared in Switzerland because that was where Fassbind worked and resided. Fassbind also participated in various conference calls cited by Lead Plaintiffs; the Court also presumes that Fassbind did so from Switzerland, and Lead Plaintiffs do not allege otherwise. To the extent that Lead Plaintiffs rely upon statements made in or issued from Switzerland, the Court cannot find that it has subject matter jurisdiction over these claims.

### b. *SEC Filings*

Lead Plaintiffs also point to purportedly false or misleading statements in filings submitted to the SEC, which they allege were prepared with the help of law firms located in the United States. (Amended Complaint ¶¶ 26, 109, 243, 259.) Defendants cite to various statements within these filings to show that they were prepared in Switzerland. (Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint at 7.) These filings "constitute U.S. conduct even though they were prepared abroad," but "the act of filing documents with the SEC is insufficient standing alone to confer jurisdiction in an action for damages." *SCOR Holding*, 537 F.Supp.2d at 568 (citing *Itoba*, 54 F.3d at 123–24). The "situs of preparations for SEC filings should not be determinative of jurisdictional questions," *Itoba*, 54 F.3d at 124, and subject matter jurisdiction can exist in securities

fraud actions where the relevant SEC filings were prepared abroad. *See, e.g., id.* In *Itoba*, however, the court applied a combination of the conduct and effects tests in finding that the fraud "has impacted detrimentally upon thousands of United States shareholders in the defrauded company." *Id.* In contrast, the heart of the fraud alleged here consists of the disclosures and statements issued from Switzerland, and the Amended Complaint does not allege a detrimental impact on shareholders in the United States. Defendants' filing of disclosures with the SEC does not permit the Court to find that Lead Plaintiffs have satisfied the conduct test by a preponderance of the evidence.

### c. *Conference Calls*

Lead Plaintiffs also assert that false and misleading statements were issued by Defendants in the following conference calls, which included as participants some CSG executives who resided in the United States:

- February 15, 2007 conference call with Dougan, Fassbind, and Calello regarding CSG's earnings for the fourth quarter of 2006 and for the 2006 financial year;
- August 2, 2007 conference call with Dougan, Fassbind, and Calello regarding CSG's earnings and operations for the second quarter of 2007;
- November 1, 2007 conference call with Fassbind "and other [CSG] officers in New York" regarding CSG's earnings for the third quarter of 2007 (Amended Complaint ¶ 254); and
- February 12, 2008 conference call with Dougan, Fassbind, Ervin, and Calello regarding CSG's earnings for the 2007 financial year.

(*See* Amended Complaint ¶¶ 230, 244, 254, 260, 265.) On these calls, Defendants allegedly made false or misleading state-

ments concerning CSG's financial results, risk management practices, and exposure to sub-prime losses. The Amended Complaint alleges that Dougan, Ervin, and Calello resided in the United States at the time that these calls were made.

The Court finds that these conference calls do not allow Lead Plaintiffs to establish subject matter jurisdiction by a preponderance of the evidence because these acts did not necessarily take place in the United States. The Amended Complaint does not specify where these conference calls originated from or where the participants (other than the Defendants) were located. In addition, the November 1, 2007 conference call took place at a time convenient for European participants, 5:00 a.m. Eastern Standard Time. (*See* Amended Complaint ¶ 265.) The Amended Complaint also refers to another earnings call on March 20, 2008, which took place at 4:00 a.m. Eastern Standard Time. (*See id.* ¶ 284.) The scheduled times of these types of calls suggest that the calls were held for the benefit of persons outside of the United States.

Nor can these conference calls be said to have "directly caused losses to investors abroad" as required under the conduct test. *Morrison*, 547 F.3d at 171, The "determination of whether American activities 'directly' caused losses to foreigners depends on what and how much was done in the United States and on what and how much was done abroad." *Id.* Given the central role in the alleged frauds played by the financial results and statements that were issued from CSG's headquarters in Switzerland, the Court cannot find that the conference calls "directly caused" the Lead Plaintiffs' losses, even if the Court could find by a preponderance of the evidence that the calls constitute conduct that occurred in the United States.

#### d. *Dougan Interview*

The Amended Complaint quotes from an interview that Dougan gave to a news agency on January 1, 2008, in which Dougan made representations concerning CSG's sub-prime exposure and risk management practices. The Amended Complaint does not specifically allege that the interview took place in New York, and Defendants cite to the 2007 Annual Report to show that Dougan relocated to Switzerland after becoming CEO of CSG in May 2007. Plaintiffs have therefore not shown by a preponderance of the evidence that this interview constitutes conduct in the United States sufficient to support a finding of subject matter jurisdiction.

#### e. *Tzolov/Butler Scheme*

Lead Plaintiffs contend that the "criminal ARS scheme," in which ARSs were placed into the money market accounts of unwitting CSG clients, took place in New York and thus supports a finding of subject matter jurisdiction. (Amended Complaint ¶ 27.) The Amended Complaint alleges that the two traders indicted in this scheme worked in New York, and that the criminal prosecution has taken place in New York.

Lead Plaintiffs are mistaken to equate the acts of Tzolov and Butler with the ARS fraud they have alleged. The ARS fraud alleged was "in connection with the purchase or sale of securities" only insofar as the scheme affected the price of CSG's stock or Defendants made misstatements or omitted to state material facts regarding the scheme. The scheme ostensibly affected CSG's financial results by allowing CSG to "reduce its own exposure to sub-prime losses as well as to garner the much higher commissions associated with the sale of high risk sub-prime securities." (*Id.* ¶ 197.) As discussed above, the heart of this fraud consists of the disclosures and

statements made about CSG's financial performance, most of which were made from Switzerland. The Court cannot assume, based on the criminal acts of Tzolov and Butler, that anyone other than Tzolov and Butler was involved in a scheme to place ARSs in client accounts with the goal of misstating CSG financial results, and that acts in furtherance of the scheme were carried out by others in New York. Although Lead Plaintiffs have alleged that two former CSG employees are being criminally prosecuted for acts that they committed in New York, Lead Plaintiffs "must nevertheless identify the locus of decisionmaking and other wrongful conduct to show that substantial acts that furthered the fraud were actually committed in this country." *SCOR Holding,* 537 F.Supp.2d at 568. The Amended Complaint does not allege that CSG or other Defendants masterminded or carried out a plan to place ARSs in client accounts and misstate financial results from New York. "[J]urisdiction must be shown affirmatively," and not "draw[n] from the pleadings inferences favorable to the party asserting it." *Shipping Fin. Servs.,* 140 F.3d at 131. The Court therefore cannot infer from the Amended Complaint's allegations regarding Tzolov and Butler that additional acts carried out by other persons involving the placement of ARSs in client accounts and the subsequent inflation of CSG financial results likely took place in New York. Lead Plaintiffs have failed to satisfy the conduct test and establish subject matter jurisdiction with respect to the ARS scheme.

### f. *Other Business Conduct in the United States*

Lead Plaintiffs cite to CSG's various other connections with or conduct in the United States to argue that the Court has subject matter jurisdiction over the claims in the Amended Complaint. However, these acts and connections do not bear a substantial relationship to the frauds alleged, and cannot satisfy the conduct test.

The Amended Complaint alleges that CSG shares trade on the NYSE through ADRs, and that CSG is therefore subject to regulation by the NYSE and the Financial Industry Regulatory Authority. The Amended Complaint also states that CSG encompasses legal entities that are registered as investment advisers with the SEC, and that CSG is also subject to the regulatory authority of the Federal Reserve System, the Commodity Futures Trading Commission, and the New York State Banking System. The Amended Complaint further alleges that CSG has previously submitted to the jurisdiction of United States courts. Finally, the Amended Complaint contends that CSG's "ubiquitous presence in the U.S. further justifies" the exercise of subject matter jurisdiction by this Court, as does CSG's potential to "benefit from the proposed Congressional bailout of the financial industry." (Amended Complaint ¶ 29.)

These arguments fail to establish subject matter jurisdiction by a preponderance of the evidence. Lead Plaintiffs have not cited any authority for the proposition that regulatory oversight is a factor in the conduct test, which focuses on the acts that constitute the fraud. *See Morrison,* 547 F.3d at 173 (conduct test requires court to "identify which action or actions constituted the fraud and directly caused harm . . . and then determine if that act or those actions emanated from the United States"). Although Lead Plaintiffs' arguments for jurisdiction based on CSG's business presence in the United States resemble the analysis for general personal jurisdiction, subject matter jurisdiction is not waivable such that a party may consent to subject matter jurisdiction before a court that lacks such jurisdiction. *See Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514,

126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) ("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.").

### 3. *Claims of Lead Plaintiffs Who Purchased ADRs*

■ The Amended Complaint provides no information about the nationalities or countries of residence of Cornwell and Grady, who allegedly purchased CSG shares by purchasing ADRs on the NYSE during the Class Period. Defendants' motion to dismiss for lack of subject matter jurisdiction makes no reference to Cornwell or Grady. However, the Court's subject matter jurisdiction over the claims of Cornwell and Grady is questionable because purchases of CSG shares through ADRs might still be considered "predominantly foreign securities transactions." *SCOR Holding,* 537 F.Supp.2d at 561 (assuming that purchases of foreign stock through purchases of ADRs on the NYSE were "predominantly foreign securities transactions").

In *SCOR Holding,* the Court found that the effects test established subject matter jurisdiction over the claims of plaintiffs who purchased foreign stock through ADRs on the NYSE. The *SCOR Holding* Court observed that "between 14% and 29%" of the foreign issuer's shares were "owned by U.S. institutional investors during the proposed class period," and that "between 7% and 11%" of the issuer's shares "traded on the NYSE in the form of [ADRs] during that time," concluding that "such broad U.S. holdings" meant that the alleged fraud satisfied the effects test, "even if it occurred entirely outside the United States." *Id.*

■ Even if Cornwell and Grady were United States residents during the Class Period, Lead Plaintiffs would still need to demonstrate that the Court has subject matter jurisdiction over Cornwell and Gra-

dy's claims through the effects test. "The required effect on United States investors can be found even when there are only a 'relatively small number of American investors,'" *id.* (*quoting Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 262 (2d Cir.1989)). "U.S. residence of individual investors—not American nationality—must be the focus of the effects test," *Europe and Overseas Commodity Traders,* 147 F.3d at 128 n. 2, but the Court has no information about whether Cornwell and Grady were United States residents during the Class Period. Even if they were, the Court cannot conclude that Lead Plaintiffs have demonstrated the required effects on United States investors.

Alternatively, even if Cornwell and Grady resided abroad during the Class Period, Lead Plaintiffs would still fail to satisfy the effects test. Defendants represent that only 4.1% of CSG's shares are traded on the NYSE through ADRs, and the Court has no information regarding the percentage of CSG shares that were owned by United States investors during the Class Period. The Court therefore cannot find that the fraud "would have had a substantial effect in the United States or upon United States citizens." *SCOR Holding,* 537 F.Supp.2d at 561 (internal quotation marks and citation omitted).

The lack of information in the Amended Complaint and lack of briefing from the parties regarding Cornwell and Grady renders this Court unable to find by a preponderance of the evidence that it has subject matter jurisdiction over plaintiffs such as Cornwell and Grady. Lead Plaintiffs have not requested that the Court find that it has subject matter jurisdiction over the claims of Cornwell and Grady and anyone else who purchased CSG shares through ADRs during the Class Period, but the Court would find that it lacks subject mat-

ter jurisdiction in any event, given the paucity of information here.

### 4. *Supplemental Jurisdiction*

■ Lastly, Lead Plaintiffs argue that the Court should exercise supplemental jurisdiction over the claims of foreign purchasers arising from the purchase of a foreign issuer's stock on a foreign exchange. Such an exercise of jurisdiction is not authorized under the supplemental jurisdiction statute, 28 U.S.C. § 1367(a), which provides, with exceptions not relevant here, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ."

■ Supplemental jurisdiction normally allows a federal court to retain jurisdiction over state law claims that are brought with claims over which the federal court has original jurisdiction. *See, e.g., Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 213–14 (2d Cir.2004) (finding supplemental jurisdiction over state law counterclaims for unpaid loans in action raising federal racial discrimination claims). Lead Plaintiffs have cited "no relevant authority for [their] proposal that the Court retains supplemental jurisdiction over jurisdictionally proper federal claims that are asserted alongside deficient ones." *Vodafone*, 2008 WL 5062669, at *7. Even if the Court could accept Lead Plaintiffs' interpretation of the supplemental jurisdiction statute, the Court does not have original jurisdiction over the "other claims" relating to the claims of foreign investors at issue here. As discussed above, the Court cannot find by a preponderance of the evidence that it has subject matter jurisdiction over claims asserted by Cornwell and Grady. There are therefore no "other claims" over which the Court has original jurisdiction, and the

Court cannot exercise supplemental jurisdiction over the claims of the foreign investors.

### III. *LEAVE TO AMEND*

■ Lead Plaintiffs seek leave to amend the Amended Complaint. Although a court "should freely give leave" to amend "when justice so requires," Fed.R.Civ.P. 15(a)(2), "it is within the sound discretion of the district court to grant or deny leave to amend. A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir.2007) (citations omitted).

The Court has determined that it lacks subject matter jurisdiction over the claims of foreign Lead Plaintiffs who purchased CSG shares on the Swiss exchange, as well as the claims of Lead Plaintiffs who purchased CSG shares through ADRs on the NYSE. The Court has made this determination in large part based on the predominance of the Swiss-centered conduct in the frauds alleged; Lead Plaintiffs' failure to establish by a preponderance of the evidence that the alleged frauds were masterminded or concocted or otherwise substantially carried out in the United States; and the difficulty of satisfying the effects test when only 4.1% of CSG's shares trade through ADRs on the NYSE. It is therefore possible that a repleading would be futile if it were based upon the same sort allegations regarding the content and location of the frauds alleged. The Court will grant leave to replead upon a request by Lead Plaintiffs plausibly showing that such a repleading would not be futile. Lead Plaintiffs shall submit any such request within twenty days of the date of this Order.

## IV. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the Court's Order dated September 28, 2009 is amended to incorporate the discussion and decision set forth above; and it is further

**ORDERED** that the motion (Docket No. 17) of defendants Credit Suisse Global, Brady W. Dougan, Renato Fassbind, D. Wilson Ervin, and Paul Calello to dismiss the amended complaint of lead plaintiffs Kevin Cornwell, John M. Grady, Erste–Sparinvest Kapitalanlagegesellchaft m.b.H., and Irish Life and Permanent plc (collectively, "Lead Plaintiffs") for lack of subject matter jurisdiction is GRANTED; and it is finally

**ORDERED** that Lead Plaintiffs may submit a request for leave to amend their complaint within twenty days of the date of this Order. Such a request must make a plausible showing that repleading would not be futile.

The Clerk of the Court is directed to withdraw any pending motions and close this case.

**SO ORDERED.**